Daniel J. Kaiser, Esq. [DK-9387]
KAISER SAURBORN & MAIR, P.C.
20 Exchange Place, 43rd Floor
New York, New York 10005
(212) 338-9100
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

NURIT KALDERON, Ph.D.,                          Civil Action No.:1: 06-cv-11501-LAK

                        Plaintiff,

        -against-                               AMENDED COMPLAINT

NEW YORK COLLEGE OF PODIATRIC                   PLAINTIFF DEMANDS
MEDICINE, EILEEN CHUSID, Ph.D.                  A TRIAL BY JURY
and MICHAEL J. TREPAL, D.P.M.,

                        Defendants.
---------------------------------------------------X

        Plaintiff, Nurit Kalderon, Ph.D., by her attorneys, Kaiser Saurborn & Mair, P.C., as and

for her complaint against defendants, under the anti-retaliation provisions of the Civil False Claims

Act, 31 U.S.C. § 3730(h), alleges as follows:

                    **PARTIES, JURISDICTION, AND NATURE OF ACTION**

        1.      Plaintiff, Nurit Kalderon  ("Kalderon" or "plaintiff" or "Principal Investigator"), is

a citizen of the State of New York. She is a biomedical research scientist with a doctoral degree,

Ph.D., in biochemistry and is the Principal Investigator on a Public Health Services ("PHS")

research 5-year grant number R01 NS39375 ("NS-Grant") to cure paralysis from spinal cord

injury in laboratory animals, in the total amount of $2,382,457.00.

        2.      Defendant, New York College of Podiatric Medicine ("NYCPM" or "defendant"),

                                           1

is an independent, private nonprofit institution organized for the purpose of educating podiatric doctors and located at 53 East 124th Street and/or 1800 Park Avenue, New York, New York 10035. Defendant is affiliated with the Foot Clinic of New York located at the same address.

3.     Eileen Chusid, Ph.D. ("Chusid" or "defendant"), is employed by NYCPM in the position of Director of Institutional Research and Dean for Pre-Clinical Sciences.

4.     Michael J. Trepal D.P.M. ("Trepal" or "defendant"), is employed by NYCPM in the position of Vice-President ("VP") for Academic Affairs and Dean.

5.     Original jurisdiction of this Court is founded upon 28 U.S.C. §1331 and 1332 (a), *et seq.*, in that this is a civil action wherein the matters in controversy arise under the laws of the United States, 31 U.S.C. §3729(a), §3730 (h), and §3732 (a).

6.     This Court has personal jurisdiction over the defendants named in the complaint pursuant to 31 U.S.C. § 3732(a) because the defendants conduct business in this district and because an act proscribed by 31 U.S.C. § 3729 occurred within this district.

7.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because all the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the complaint occurred in this District.

8.     Defendants retaliated against plaintiff because she complained that defendants were misappropriating and mishandling funds in connection with the NS-Grant by interfering and disrupting the proper management of the grant, failing to seek renewal of the NS-Grant, refusing to renew the NS-Grant, requesting fraudulent reimbursements in connection with the NS-Grant, illegally terminating the NS-Grant contract, defaming plaintiff to third parties, including the National Institutes of Health ("NIH"), and finally by terminating plaintiff's employment.

I.

THE NIH GRANT

9.      As described under the NIH Grant Policy Statement ("NIHGPS"), NIH, as a

Federal grantor agency, provides specific funding/awards for investigator-initiated research

projects which are termed RO1 research grant awards. These are awarded by the NIH both to the

investigator, the principal investigator ("PI"), who conceived and performs the research project

and who wrote the grant application, and to the grantee institution which committed itself to

providing the necessary administrative support and facilities for the successful progress of the

research project.  These grants are awarded for a period of 3-5 years and can be renewed for

additional periods by the submission of a competing grant renewal.

10.     According to the NIHGPS, the role/duties of the grantee institution are:

    a.      to serve as a bank at which the NIH funds are deposited into a special
            account under the PI's project title, where these funds can be used by the
            PI only;

    b.      to provide the necessary facilities and administrative support to conduct
            the research  project; and

    c.      to comply, through certifications and assurances, with a number of public
            policy requirements as listed in the grant application.

11.     According to the NIHGPS, as with banks, the grantee institution provides its

services/duties in exchange for a hefty administrative fee termed Indirect Costs ("IDC") or

Facilities and Administrative Costs ("F&A Costs").  NIH reimburses the grantee institution

according to a special fee rate.  The fee rate of the F&A Costs is negotiated between the grantee

and the Division of Costs Allocation at the Department of Health and Human Services ("DHHS").

If the grantee fails to establish such rate agreement, NIH does not reimburse the grantee for these

3

IDC service fees.

12.     According to the NIHGPS, the Direct Costs of an RO1 grant belong exclusively to the PI. Only the PI has authority to dispense these funds, namely, to issue a purchase order, a check request, etc. As with a bank, the role of the grantee is to examine whether there are sufficient funds to cover the signatory requested transaction.  In the same manner as with a bank, it is prohibited for the president, the vice presidents, the dean, and/or any employee of the grantee other than the PI of the RO1 grant to charge and/or dispense, even a penny, of the Direct Costs. Finally, the PI, who is a member of the grantee team, is responsible for ensuring compliance with the financial and administrative aspects of the award, has the legal duty and authority to supervise and monitor the grant's accounting and financial management by the grantee institution, and to notify the authorities of any misappropriation of funds.

13.     In 2005 NIH awarded more than 10 billion dollars for 28,622 RO1 grants with an average total cost of $359,451 per grant for a single year.  In New York City, New York University School of Medicine was awarded that year 204 such grants, namely supporting 204 individual research projects.  In contrast, NYCPM during a period of 33 years, 1972 through 2005, was awarded only one 5-year RO1 grant which ended in November 1992.

14.     The NS-Grant was awarded by the NIH specifically, by the National Institute of Neurological Disorders and Stroke ("NINDS"), to conduct research in laboratory animals to cure paralysis in the project entitled PRE-CLINICAL STUDIES OF SPINAL-CORD INJURY REPAIR for the period 08/22/2000 - 07/31/2006.

15.     The NS-Grant is in the total sum of $2,382,457.00, covering the research Direct Costs and administrative fees, IDC, paid to the grantee institution.

16.    Since 1980, plaintiff has been the PI on several federal research and major research equipment grants awarded by the NIH and the National Science Foundation.  The grantee institutions were The Rockefeller University and Sloan-Kettering Institute for Cancer Research ("Sloan-Kettering").

17.    The original grantee institution of the NS-Grant was Sloan-Kettering, located at 1275 York Avenue, New York, New York, 10021.  The F&A Costs reimbursed by NIH to Sloan-Kettering for sponsoring the project were at a rate of 66.5%, a modified rate of total Direct Costs base per agreement with the DHHS and which amounted to $872,055.00 covering the period 08/22/00 through 11/30/05.

18.    In August of 2005, in reliance on the verbal and written commitments made by NYCPM to support the research project, plaintiff requested that Sloan-Kettering relinquish the NS-Grant to NYCPM as of December 1, 2005.  Accordingly, on or about October 5, 2005, Sloan-Kettering signed a relinquishing statement ("Relinquishing Statement") signifying its willingness to relinquish and terminate as of November 30, 2005, its interests and rights in the NS-Grant.

19.    On or about October 25, 2005, NYCPM, by it's authorized organizational official, the President of NYCPM, Mr. Louis Levine ("Levine"), signed the PHS grant application ("The Contract") requesting Change of Grantee Institution to sponsor the funded research project of the Principal Investigator, Nurit Kalderon, entitled "PRE-CLINICAL STUDIES SPINAL CORD INJURY REPAIR" for the remainder of the funded period starting from December 1, 2005 through July 31, 2006, for the total estimated sum of $171, 725.00.

20.    By signing on October 25, 2005, on the above mentioned application requesting

the Change of Grantee Institution, NYCPM signed a contract with the NIH and with plaintiff by which NYCPM presented that in exchange for the transfer of the legal and administrative responsibility for the NS-Grant supported project it would provide all the facilities and resources that would permit successful performance of the project.

21.    By signing on October 25, 2005, on the above mentioned application requesting the Change of Grantee Institution, NYCPM signed a contract with the NIH and with plaintiff by which, *inter alia*, as of October 25, 2005, it cannot take any unilateral action to reverse itself, to dissolve and/or terminate The Contract, to transfer The Contract, and/or to change the terms of The Contract. Any such action requires prior approval by the NIH. Requests for prior approval cannot be made unilaterally, without the PI's perquisite signature.

22.    A major provision of The Contract was that NYCPM is committed to the long-term support of the research project to cure paralysis by sponsoring the submission of the forthcoming 5-year competitive grant renewal as well as providing the necessary research facilities and the required administrative support.

23.    NYCPM's executives promised long-term support for the project to cure paralysis in The Contract. The NIH-NINDS officials relied on NYCPM's commitment and approved the transfer of the legal rights to the NS-Grant from Sloan-Kettering to NYCPM. NYCPM promises were false. NYCPM's executives, knowing that it was unlawful, deliberately frustrated the purpose of the NS-Grant by refusing to sponsor the 5-year grant renewal after having hobbled it by failing to provide the material support required by the terms of the Contract.

24.    The yearly Direct Costs of the NS-Grant were in the range of about $300,000.00. This provided funding for extensive research capacities and related progress of the project,

covering salaries of several professional investigators, animal expenses, costs of MRI studies, etc.

25.     The award monies transferred from Sloan-Kettering to NYCPM were residual unexpended funds.  The initial/critical portion of the project to be performed at NYCPM was devoted to summarizing and publishing the data obtained thus far in the project; and most importantly, to the writing of a competitive 5-year grant renewal with the submission deadline date of March 1, 2006.  The estimated yearly Direct Costs to be requested for the continuation of the project to cure paralysis would have been $360,000.00.

26.     Accordingly, the Principal Investigator, as set forth under The Contract, would devote most of her effort to the writing of the grant and of the papers.  Attaining the next 5-year grant is critical for the successful progress of the project.

27.     On November 5, 2005 plaintiff submitted The Contract to the NIH-NINDS officials for review.

II.

KALDERON'S NYCPM EMPLOYMENT

28.     During the later part of 2004 negotiations concerning plaintiff's move to NYCPM were conducted between Kalderon and the former Dean of Pre-Clinical Sciences, Robert Bressler, Ph.D., ("Bressler"), and Chusid, as part of NYCPM's efforts to develop federally funded basic biomedical research on its campus.

29.     On or about February 22, 2005, plaintiff was appointed a Research Associate Professor of Pre-Clinical Sciences at the NYCPM.  She commenced her employment on December 1, 2005, on the date the NS-Grant was transferred to NYCPM, at which time she began to be paid a salary.

30.    In June through August of 2005, plaintiff conducted negotiations regarding possible transfer of the NS-Grant from Sloan-Kettering to NYCPM, with the official agents of NYCPM, including Trepal, Chusid, Bressler, the VP for Finances, Mr. William Epstein ("Epstein"), and the VP for Operations Mr. William Graham ("Graham").

31.    The date of the transfer of the NS-Grant was set for December1, 2005, to allow sufficient time for preparation of the facilities and a smooth transition to minimize any adverse effects on the progress of the research and the project.  Most importantly, this was done to allow the Principal Investigator time to settle in during the month of December, and at least two months for the writing of the 5-year competitive grant renewal, which was due for submission on March 1, 2006.

32.    In August of 2005, in reliance on the verbal and written commitments made by NYCPM to support the Principal Investigator and the progress of the research project, plaintiff requested that the official agents of Sloan-Kettering relinquish the NS-Grant to NYCPM as of December 1, 2005.

33.    On or about October 5, 2005, Sloan-Kettering signed the Relinquishing Statement dated September 1, 2005, based on plaintiff's request signifying its willingness to relinquish and terminate as of November 30, 2005, its interests and rights in the NS-Grant as well as to all recommended future support of this project.

34.    In the Relinquishing Statement Sloan-Kettering relinquished the estimated unexpended sum of $171,725.00 ($103,138.00 in Direct Costs and $ 68,587.00 in F&A Costs). The final amount relinquished was $203,132.00.

8

III.

DEFENDANTS' FRAUD IN CONNECTION WITH NIH GRANT

35.    During negotiations for the transfer of the NS-Grant from Sloan-Kettering to NYCPM defendants knowingly misrepresented the level of the facilities and administrative support that would be made available for the research project funded by the NS-Grant and knowingly violated the terms of The Contract regarding administrative and facilities support and budget expenditure.

36.    NYCPM knowingly submitted fraudulent claims for reimbursement of F&A Costs that were not expended in connection with the NS-Grant.

37.    NYCPM fraudulently refused to insure the laboratory equipment, which was purchased by the NS-Grant, in violation of the DHHS post-award regulations.

38.    NYCPM illegally failed to provide plaintiff signatory authority in connection with the Direct Costs portion of the funds and, correspondingly, charged expenses that were not authorized by plaintiff.

39.    Defendants illegally and fraudulently denied plaintiff access to the NS-Grant funds for utilization in her research project.

40.    On February 22, 2006, defendants submitted a letter to NIH that knowingly contained misrepresentations concerning plaintiff and defendants' administration of the NS-Grant.

41.    From March 2006, defendants refused to provide the Principal Investigator the research facilities as promised in the Contract.

42.    Upon information and belief, defendants accepted transfer of the NS-Grant knowing that it had no intention of properly administering and managing the grant.

9

43.     Defendants fraudulently acquired approximately $73,000.00 in NS-Grant monies that it refused to return upon relinquishment of the NS-Grant.

IV.

PLAINTIFF'S COMPLAINTS

44.     During the period from September 2005, through February 2006, plaintiff wrote and verbally brought to the attention of NYCPM officials errors and legal violations concerning the financial and administrative aspects of The Contract and award monies.  Plaintiff's complaints, included, but were not limited to, those delineated in this complaint.

45.     On November 28, 2005, two days before plaintiff and the project had to vacate Sloan-Kettering, plaintiff came to the Lee building for final inspection of the area in which the office space should have been constructed and discovered that Ms. Kalderon was intentionally misled by NYCPM.  Trepal's written assurances of November 8, and November 23, 2005, that the research facilities as promised under The Contract would be functionally ready on December 1, 2005, were false.

46.     Graham never showed up for the scheduled facility inspection meeting and instead a maintenance person showed up to notify plaintiff that the remodeling would be made in a different room, and that the space would be reduced by half to about 150 sq. ft., cutting out the space for the digital imaging laboratory.

47.     On November 29, 2005, by email, plaintiff brought to the attention of Trepal that NYCPM was in violation of federal guidelines, knowingly making false claims to the NIH for payment and/or approval. Specifically, that the promises and claims of NYCPM in The Contract of October 25, 2005, requesting Change of Grantee Institution were false as the promised

10

facilities were non-existent.  Stating as follows:

> "On October 25, 2005 the President of NYCPM had signed an
> NIH application for Change of Grantee Institution (copy
> attached) committing NYCPM to sponsor the continuation of
> my research project by providing the necessary resources as
> listed on the Resources page (copy attached ) in exchange of
> ~$70,000 indirect costs. NYCPM commitment of
> October 25th for providing the required resources is false."

48.     In that email plaintiff asked Trepal for a truthful and professional resolution to

this matter.   Asking as follows:

> "The question is where do we go from here? **Will the
> NYCPM get their act together** and conduct their business in
> a professional manner **or should the NIH be notified about
> these serious violations?"** (emphasis added)

49.     On November 29, 2005, in an email, plaintiff brought to the attention of Trepal

that:

> "Today November 28th when visiting the Lee Building I was
> alarmed to find that NYCPM administration is in serious violation
> of federal guidelines, i.e., attempting to obtain indirect cost monies
> ($70,000) by false promises."

50.     On November 29, 2005, in an email, plaintiff brought to the attention of Trepal

that:

> "Today, two days before the Federal effective date of my moving
> into the new institution and contrary to your promises in emails of
> September 22 through November 23rd I found that the officially
> promised office and imaging laboratory space is non-existent."

51.     On November 29, 2005, in an email, plaintiff brought to the attention of Trepal

that:

> "Examination of the facts (listed below) shows that it is not a
> sudden financial hardship that lead to the false unfulfilled promises
> but merely a whim to continue and maintain a fancy food
> preparation lounge."

52.    On November 29, 2005, in an email, plaintiff reminded Trepal of the facts and

asked for a truthful answer:

> "As you are well aware of, SKI [Sloan-Kettering] **was not that
> keen to relinquish my grant;** they were quite happy to have me
> here and collect the indirect cost monies.  After much pressure SKI
> relinquished my grant; **in two days I am suppose to vacate my
> space at SKI** to be moving, **moving to where?"**

(emphasis added)

53.    In view of the complete lack of adequate research facilities for the NS-Grant in

November 2006 Trepal must have known that NYCPM did not possess the office and laboratory

facilities required by Dr. Kalderon's research and the NS-Grant.  By representing to Dr. Kalderon

that the office and laboratory facilities would be properly prepared Trepal intentionally

misrepresented the present condition of NYCPM's research facilities and thereby fraudulently

induced Dr. Kalderon to commence her employment and proceed with the transfer of the NS-

Grant.

54.    In mid-December 2005, following the NIH-NINDS notification of December 7,

2005, that the NS-Grant, "was transferred, effective December 1, 2005," Kalderon requested

both from Chusid and Epstein that the finance department of NYCPM issue an account number

for the amount of the Direct Costs of the NS-Grant for the exclusive use of the Principal

Investigator. Plaintiff also requested to have all the required forms for purchasing and for

reimbursement by check request.

12

55.     Kalderon placed, to no avail, the above mentioned requests verbally and by email  to Epstein and Chusid repetitively from mid-December 2005, through February 2006.

56.     On January 17, 2006, Kalderon wrote to Chusid, sending copies also to Trepal and Epstein:

> "Tomorrow when I come for our meeting first on the agenda: the use of my funds as dictated by the NIH guidelines – thus far I been **denied/prevented to conduct my research**.  I hope that **after 48 days and numerous requests/reminders** (by you and I), the Financial Vice President, Bill Epstein,  got his act together and has issued an **account #**  for my NIH grant, NS39375, and has generated the **Expenditure Report** for the month of December."

(emphasis added)

57.     On January 18 and 19, 2006, plaintiff complained in writing to defendants of the financial mishandling of the NIH grant.

58.     On January 20, 2006, in response to plaintiff's January 17-19, 2006 emails Trepal notified plaintiff that such accusations would no longer be tolerated by him and that NYCPM has terminated its support of the research project by refusing to sign on for the 5-year competitive grant renewal she was preparing for submission on March 1, 2006, as written in his email:

> "I have been following the back and forth emails. … [c]ommunications from yourself like this most recent where you made accusations are inflammatory, unnecessary and will **no longer be tolerated.**  …it may be advisable for you to **start looking for another institution** to work with **in terms of any grant renewal.**" [emphasis added]

59.     On January 22 and 25, 2006, via email, plaintiff complained to defendants of federal violations in connection with the administration of the NS-Grant.

60.     On February 3, 2006 Trepal wrote to plaintiff and stated:

> "**Over the past few weeks you have made** both in writing and
> verbally, **serious** and unsubstantiated **allegations that NYCPM,
> including many of its administrative staff are in violation of
> Federal** and/or State **law**. … Accordingly we have been in high
> level contact with the appropriate authorities at NIH and NYS to
> discuss your grant." (emphasis added)

61.     On February 7, 2006, in response to Trepal's January 20 and February 3, 2006

emails, plaintiff complained in writing to Trepal, in a 9-page letter, citing those emails and

detailing all of defendants' violations and fraud in connection with the administration of the NS-

Grant. Plaintiff made it clear that if a voluntary resolution was not possible she would seek a

judicial resolution.

62.     Specifically, plaintiff stated in her February 7, 2006 communication to Trepal that

defendants were guilty of "major fraud against the United States" and that she would "file this

complaint in court. Further, in conjunction with my complaint I will also submit a copy of it to the

Justice Department."

63.     Specifically, plaintiff also stated in her February 7, 2006 correspondence to Trepal

that NYCPM fraudulently collected F&A cost awards for which it did not incur any expenses in

connection with the NS-Grant, fraudulently funneled portions of the direct cost awards into

NYCPM general pool of funds and away from the NS-Grant, and fraudulently charged

unauthorized salary expenses to the NS-Grant.

64.     Plaintiff continued to object to defendants' illegal and fraudulent conduct after her

employment with NYCPM ended.

65.     In connection with her on-going concerns about defendants' illicit behavior

concerning the NS-Grant, plaintiff, in a letter dated July 31, 2006, and again in an e-mail dated

14

August 11, 2006, requested from NYCPM all financial records of the NS-Grant including its fraudulent May 1, 2006, Relinquishing Statement. Those requests were denied by defendants.

66.     In a letter to defendants dated September 15, 2006, plaintiff detailed defendants' fraudulent conduct and the funds NYCPM embezzled and Kalderon provided NYCPM a final opportunity to remedy the fraud prior to commencing legal action, including a False Claims Act lawsuit.

V.

THE RETALIATION

67.     In response to the above mentioned complaints instead of implementing corrective actions NYCPM moved to terminate The Contract, terminate plaintiff's employment at NYCPM, and irreparably injure the NS-Grant by complaining to NIH.

68.     On or about November 29, 2005, in response to plaintiff's complaint email of that day, Trepal explicitly threatened plaintiff that if she complained to the NIH about NYCPM's conduct with respect to the NS-Grant there would be serious consequences for plaintiff. Trepal stated:

> "A threat **to notify NIH of 'serious violations'** at this point in time **is not only inappropriate but** bespeaks an attitude towards this institution that **is counterproductive from the start.**"

(emphasis added)

69.     On January 20, 2006, two weeks after receipt of the award money, Trepal in retaliation to Kalderon's email of January 19, 2006, notified plaintiff by email that she should start looking for another grantee institution to have it sign on for the 5-year competitive grant renewal she was preparing for submission on March 1, 2006. Further, that NYCPM was taking actions to

terminate the NS-Grant research project altogether, but, at the same time, it would continue to

collect the grantee benefits, namely, the F&A Costs.  Trepal's actions were taken because

Kalderon's demands, for compliance with the terms and provisions of The Contract, would no

longer be tolerated by Trepal, as written in his email:

> "[c]ommunications from yourself like this most recent where you
> made accusations are inflammatory, unnecessary and will **no longer**
> **be tolerated** . . . it may be advisable for you to **start looking for**
> **another institution** to work with **in terms of any grant renewal.**"

(emphasis added)

70.     On or about February 3, 2006, in response to Kalderon's January 16-25, 2006,

Trepal acknowledged that plaintiff was complaining about serious legal violations that could result

in legal action writing in an e-mail:

> "Over the past few weeks you have made both in writing and
> verbally, serious and unsubstantiated allegations that NYCPM,
> including many of its administrative staff are in violation of Federal
> and/or State law....Accordingly, we have been in high level contact
> with the appropriate authorities at NIH and NYS to discuss your
> grant."

71.     On or about February 22, 2006, in retaliation to Kalderon's letters of January 16-

25 and of February 7, 2006, Chusid filed a letter of complaint against the Principal Investigator

with the NIH-NINDS officials.  Chusid knowingly submitted to the NIH-NINDS officials

materially false, fictitious, or fraudulent statements and/or libelous representations about

Kalderon, seeking to unlawfully terminate The Contract by knowingly scheming to have the

Principal Investigator removed from the project and to permanently discontinue the NS-Grant

funded project by accusing the Principal Investigator of financial misconduct with respect to the

NS-Grant award.

72.     Chusid, by the above mentioned complaint letter to the NIH dated February 22, 2006, knowingly and deliberately falsified, concealed and covered up the material facts that NYCPM failed to and still refuses to provide the Principal Investigator the promised laboratory and office space to perform the funded project, while at the same time NYCPM has been fraudulently collecting F&A Costs and mismanaging the Direct Costs of the NS-Grant.  Chusid wrote:

> "As you are aware . . . the grant was transferred here, **effective December 1, 2005.**  To date, however, **the principal investigator has refused to begin research at this facility** (in laboratories constructed to her specifications), allegedly finding numerous problems with the lab set up.  We do not agree that there are any legitimate problems with the design or the construction of the lab.  Particularly troubling is recent correspondence to us, which in part suggests that the principal investigator believes that College has no right to oversee the administration of her work on the grant-funded research."

> "It has become clear to us that we cannot properly discharge our oversight obligations with respect to grant RO1 NS039375 **because the principal investigator has not reported to work. . . . We also do not see how we can continue to permit salary for the principal investigator to be paid from the grant funds.**"

> "Please accept this letter as formal notice that the New York College of Podiatric Medicine no longer believes it to be feasible to oversee or have any involvement in grant RO1 NS39375."

(emphasis added)

73.     In retaliation to plaintiff's request of February 7, 2006,  plaintiff received from NYCPM an overnight envelope that contained 4 letters.  A copy of the letter of Chusid dated February 22, 2006, a letter from Trepal, a statement of charges from Levine and a letter from the chairman of the Credentials, Promotions & Standards Committee ("Credentials Committee") of

NYCPM, Dr. Terry Spilken. The combined message of these letters was that on March 6, 2006,

NYCPM's Credentials Committee, at the request of Levine and Trepal, would conduct an urgent

meeting to terminate plaintiff's employment at NYCPM.

74.     In the letter dated February 28, 2006, Trepal wrote:

"I write **in response to your letter of February 7**, as well as to
your related e-mail communications to us . . . As such, by a letter
dated today we have informed the NIH of the problems detailed
above . . . This letter shall also serve as notice that, in light of your
repeated and continual absence from work and your refusal to
perform your assigned duties, the **New York College of Podiatric
Medicine intends to pursue the process governing termination
of faculty employment with the College**, as set forth in the
Faculty Handbook.  We trust this makes our position sufficiently
clear." (emphasis added)

75.     On  March 8, 2006, plaintiff was advised that her employment was being

terminated.

76.     In a letter dated March 8, 2006, Levine wrote:

"I write **in furtherance of my letter of February 28, 2006.**  In
that letter, I advised you that the New York College of Podiatric
Medicine, was seeking the termination of your employment with the
College.   I accept the Committee's recommendation and report,
and **hereby notify you that your employment as a faculty
member** at the New York College of Podiatric Medicine **is hereby
terminated.**  Consistent with the relevant provisions the
termination will be effective as of April 20, 2006."

(emphasis added)

77.     On or about March 20, 2006, after 50% of the 8-month award period had

elapsed, NYCPM, by its President Levine, refused Kalderon's requests to prepare the facilities

and have the research project and the Principal Investigator move into these facilities.  Levine

explained that NYCPM "elected" to discontinue The Contract with the NIH and the Principal

Investigator and therefore it was refusing to allow the Principal Investigator to move into

NYCPM:

> "[h]ere **NYCPM** has determined that it will no longer be a grantee
> institution, and **will not authorize work on that grant to occur
> on its premises** given the imminent relinquishment of the grant to
> NIH."

(emphasis added)

78.     Since plaintiff's termination, defendants, and managers employed by defendants,

have filed a frivolous lawsuit against plaintiff claiming, without a shred of factual support, that

they were defamed by Kalderon.

79.     Upon information and belief, defendants filed their frivolous legal claims against

plaintiff in order to further retaliate against her and to attempt to deter her from further exposing

their fraudulent behavior with respect to their handling of the NS-Grant.

80.     The adverse employment actions taken against plaintiff, including, but not limited

to, refusing to sign on the competitive grant renewal, termination of the NS-Grant and plaintiff's

employment, as well as defendants' post-termination retaliation taken against plaintiff, were

because of her complaints to defendants and the NIH, and her corresponding threats to report the

illegal conduct to the Justice Department and file a court complaint, that defendants actions in

connection with the NS-Grant were fraudulent, including, but not limited to, false claims and the

misappropriation of federal monies, and in violation of federal law.

81.     Defendants' actions were malicious and/or in reckless disregard of plaintiff's civil

rights.

FIRST CAUSE OF ACTION
AGAINST ONLY NYCPM

[Retaliation]

82.     Pursuant to Fed.R.Civ.P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 81 with the same force and effect as if separately alleged and reiterated herein.

83.     NYCPM  illegally retaliated against plaintiff because she complained that defendants were engaged in illegal fraudulent conduct concerning the grant of federal money in violation of federal law, and in particular, 31 U.S.C. § 3129(a).

84.     By reason thereof, NYCPM has violated 31 U.S.C. §3729(a), *et seq.*, and have caused plaintiff to suffer damages, including lost past and future earnings, other employment benefits, reputation loss, and emotional injuries.

SECOND CAUSE OF ACTION
AGAINST ONLY NYCPM

[Breach of Contract]

85.     Pursuant to Fed.R.Civ.P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 81 and 83 with the same force and effect as if separately alleged and reiterated herein.

86.     NYCPM breached The Contract governing the transfer of the NS-Grant from Sloan-Kettering to NYCPM and its management by NYCPM.

87.     As a consequence of NYCPM breach plaintiff has suffered financial injuries in an amount to be determined at trial.

20

THIRD CAUSE OF ACTION
AGAINST ALL DEFENDANTS

[Defamation]

88.     Pursuant to Fed.R.Civ.P. 10(c), plaintiff repeats and realleges each and every

allegation contained in paragraphs 1 through 81, 83 and 86  with the same force and effect as if

separately alleged and reiterated herein.

89.     On February 22, 2006, NYPMC, by Chusid, filed a misconduct complaint letter

against Kalderon with the NINDS Chief Grants Management Officer, Michael Loewe, and the

Grants Management Specialist, Ms. Kimberly Campbell, that knowingly falsely accused plaintiff

of: 1) not reporting to work, 2) abandoning her professional responsibilities in connection with the

NS-Grant, and 3) refusing to move into the laboratory defendants claim was prepared for her on

December 1, 2005.

90.     Defendants repeated their defamatory statements in a letter by Chusid dated May

9, 2006 when they submitted to the NIH a relinquishing statement in connection with the NS-

Grant wherein they falsely claimed that plaintiff had abandoned the project but was still was

drawing a salary from the NS-Grant, had refused to move in to the provided facilities, and had

refused to perform work on the project.

91.     Upon information and belief, defendants repeatedly made the same defamatory

statements verbally to representatives of NINDS.

92.     At no time did plaintiff refuse to move in, abandon the NS-Grant, or in any manner

or respect refuse to work on the NS-Grant funded project.

93.     Defendants knowingly made false statements concerning plaintiff which were

21

severely damaging to her professional reputation and are defamatory *per se*.

94.     By reason thereof, plaintiff's reputation has been severely damaged, including but not limited to her ability to get NIH grant funding, and causing emotional injuries in an amount to be determined at trial.

FOURTH CAUSE OF ACTION
AGAINST ALL DEFENDANTS

[Fraudulent Inducement]

95.     Pursuant to Fed.R.Civ.P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 81, 83, 86 and 89 through 93 with the same force and effect as if separately alleged and reiterated herein.

96.     In November 2005, including, but not limited to, in letters dated November 8, 2005, and November 22, 2005, defendants made false representations to plaintiff concerning their intentions to honor the terms of The Contract in order to secure transfer of the NS-Grant and further to induce plaintiff to commence and continue her employment with NYCPM.

97.     Upon information and belief, at the time defendants made said representations they knew them to be false.

98.     By reason thereof, defendants fraudulently induced plaintiff to commence and continue her employment with defendants and agree to the transfer of the NS-Grant to NYCPM and thereby Kalderon has suffered damages, including, but not limited to, lost past and future earnings, other employment benefits, emotional injuries, and damage to her professional reputation.

22

WHEREFORE, plaintiff demands judgment against defendants as follows:

(i)     On the First Cause of Action assessing actual and punitive damages against

        NYCPM in an amount to be determined at trial and reinstatement;

(ii)    On the Second Cause of Action assessing actual damages against NYCPM in an

        amount to be determined at trial;

(iii)   On the Third Cause of Action assessing actual damages and punitive damages

        against defendants in an amount to be determined at trial;

(iv)    On the Fourth Cause of Action assessing actual damages and punitive damages

        against defendants  in an amount to be determined at trial;

(v)     Attorney's fees, disbursements and other costs; and

(vi)    For such other relief as the court deems just and proper.


## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a jury trial

of all issues capable of being determined by a jury.

Dated: New York New York
       February 6, 2007

                        KAISER SAURBORN & MAIR, P.C.
                        Attorneys for Plaintiff


            By:
                        Daniel J. Kaiser, Esq. [DK-9387]

                        20 Exchange Place, 43rd Floor
                        New York, New York 10005
                        (212) 338-9100

## AFFIDAVIT OF SERVICE BY FAX & FEDEX

Paul Michele Filipanics, being duly sworn, deposes and says, that he is not a party to the within action, is over 18 years of age and resides in New York State.

That on the 6th day of February, 2007, affiant served the within **Amended Complaint** upon defendant by faxing and by sending via Federal Express Priority Overnight delivery a true copy of the same to:

Russell I. Zuckerman, Esq.
Ward Norris Heller & Reidy, LLP
300 State Street
Rochester, New York 14614
F: 585-423-5910

This true copy was sent to the address referenced above by depositing the envelope in an official depository of the United States Postal Service within the State of New York.

PAUL MICHELE FILIPANICS

Sworn to before me this
6th of February, 2007

_____
NOTARY PUBLIC

DANIEL J. KAISER
Notary Public, State of New York
No. 02KA6135385
Qualified in New York County
Commission Expires October 17, 20__